**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE EXTERIOR COMPANY, INC., et al. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  24-4252 |
| | : | |
| MASSACHUSETTS BAY INSURANCE | : | |
| COMPANY | : | |

**MEMORANDUM**

SCHMEHL, J.  /s/ JLS                                          FEBRUARY 19, 2025

   This action was originally brought by Plaintiffs in the Court of Common

Pleas of Lancaster County, then removed by Defendant to this Court on the basis of

diversity of citizenship. Plaintiffs claim that Defendant Massachusetts Bay Insurance

Company ("MBIC") breached an insurance contract it held with Plaintiff Upper Dublin

Sports Center ("UDSC") for repairs to UDSC's roof when it (a) initially refused to

authorize a commercially reasonable repair to the roof; (b) refused to approve an

appropriate repair to the flat portion of the roof; (c) did not approve overhead and profit;

(d) utilized a price list based on the date of loss instead of the date the repairs were

made; and (e) declined to pay for damage caused by a pipe that was broken in the

course of repairs. Presently before the Court is MBIC's Fed.R.Civ.P.12(b)(6) motion to

dismiss for failure to state a claim. For the reasons that follow, the motion is granted in

part and denied in part.

**STANDARD OF REVIEW**

   Under Rule 12(b)(6), the court must "accept all factual allegations as true

[and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty.*

*of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Only if "the '[f]actual allegations ... raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id*. at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. (explaining that determining "whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

## FACTUAL ALLEGATIONS

Plaintiff, The Exterior Company, Inc. ("TEC"), is a Pennsylvania corporation and roofing contractor. Am. Compl. at ¶¶ 1,11. Plaintiff UDSC or the "Tennis Club") is a fictitious name for a Pennsylvania limited liability company by the name of Upper Dublin SC, LLC. *Id*. at ¶ 2.

The Tennis Club is a "premier high-end sporting facility that serves as a regional hub for tennis." *Id*. at ¶ 5. It "features a unique and beautiful tongue and groove wood roof that is both practical protection of its courts and facilities and architecturally stunning." *Id.* at ¶ 7.

The Tennis Club was insured with MBIC under Policy Number ZDY A573369 06 (the "Policy") for the period of March 8, 2021 through March 8, 2022. *Id*. at ¶ 14. Under the Policy, the Tennis Club paid a total annual premium of $10,819.00 for coverage of up to $9,746,588.00 in property damage. *Id*. at ¶ 15.

In mid-2021, the tongue and groove roof was damaged in a storm. *Id*. at ¶ 9. The Tennis Club retained TEC to assess the damage and make recommendations for repairs. *Id*. at ¶ 10. After assessing the damage, TEC recommended "over-decking the existing unique wooden roof deck to properly attach the new shingles to a solid decking surface, as is required by local building codes, thus preserving its aesthetic appeal while still providing a complete long-term repair that is code complaint." *Id*. at ¶ 12.

In order to permit TEC to negotiate directly with MBIC, the Tennis Club assigned its right under the Policy to TEC. *Id*. at ¶ 16. MBIC accepted the assignment. *Id*. at ¶ 21. TEC proposed to MBIC that the over-decking method of repair be used. *Id*. at ¶¶ 18-19. According to Plaintiffs, this method is more expensive than traditional repair methods but was necessary given the unique nature of the roof. *Id*. at ¶ 20.

Because MBIC was not certain that over-decking was needed to repair the roof, MBIC inspected the roof on April 23, 2023. *Id*. at ¶¶ 22-23. MBIC brought a consultant to the inspection who indicated that a "tie-in" method "could be used to allow replacement of the shingle roof without needing to repair the adjoining flat roofing system." *Id*. at ¶ 25. TEC disagreed that the "tie-in" method was appropriate and requested that MBIC's consultant provide a "Construction Detail Drawing" to illustrate the application of the "tie-in" method of repair on UDSC's roof. *Id*. at ¶ 27. TEC was particularly concerned whether the "tie-in" method would be adequate to properly waterproof the roof and whether the "tie-in" method would provide a "long-term solution and satisfy code requirements." *Id*. at ¶¶ 28-29. "At all times, [MBIC] indicated that it

intended to offer coverage for the damage to the Tennis Club roof and would pay for reasonable repairs." *Id*. at ¶ 24.

On May 15, 2023, MBIC provided its consultant's scope of work. *Id*. at ¶ 30. According to Plaintiffs, the scope was half a page in length and "provided no direction on how a tie-in method would be feasible for the Tennis Club's roof." *Id*. at ¶ 31. When asked for further clarity, the consultant provided a "generic Construction Detail Illustration that bore no relevance to the roofing system on the Tennis Club's roof…" *Id*. at ¶ 32.

On May 30, 2023, TEC sent a drawing to MBIC reflecting its understanding of how a "tie-in" method on the Tennis Club's roof would work, which included leaving the damaged shingles on the roof, and requested that MBIC confirm if it was approving the illustrated method. *Id*. at ¶ 33. MBIC's consultant refused to confirm if TEC's illustration was approved or recommended. *Id*. at ¶ 34. Instead, MBIC hired another roofing consultant to evaluate whether the "tie-in" method could be performed on the Tennis Club's roof. *Id*. at ¶ 35.

On June 13, 2023, MBIC "provided two estimates from roofing contractors to perform the roof repair, neither of which included any explanation for how the tie-in method was supposed to work on the Tennis Club's unique roof." *Id*. at ¶ 36. Meanwhile, TEC retained its own independent engineer to advise if the "tie-in" method could be performed on the Tennis Club's roof. *Id*. at ¶ 37.

On June 19, 2023, Roofing Dynamics Group inspected the Tennis Club's roof and concluded: "'Broadly speaking, no effective long-term tie-in along the entire lineal interface between a new shingle roof and the low slope roofs extant currently is

possible.'" *Id*. at ¶¶ 38-40. Nevertheless, MBIC continued to refuse to approve the over-decking method and "further declined to approve the replacement of the built-up flat roofing systems, instead insisting that an improper and unstable tie-in method of repair be used at the steep slope/flat roof junctions." *Id*. at ¶ 41. MBIC continued to represent to UDSC that the roof repairs would be covered under the Policy and that "it was merely a matter of what type of repair would be offered." *Id*. at ¶ 42.

On July 13, 2023, Counsel for TEC wrote to MBIC, stating that MBIC's actions in attempting to delay the roof repair and forcing the Tennis Club to suffer business losses despite the availability of a commercially reasonable repair, constituted bad faith. *Id*. at ¶ 43. On July 18, 2023, MBIC informed UDSC that it was no longer accepting the Assignment of Benefits to TEC. *Id*. at ¶ 44.

MBIC itself agreed to assess the repairs needed for the Tennis Club's roof. *Id*. at ¶ 45. On August 8, 2023, MBIC finally agreed that TEC's over-decking method was proper on the vast majority of the roof. *Id*. at ¶ 46. On that same date, MBIC "again represented to UDSC and TEC that it was offering coverage for the Tennis Club roof and would pay for the reasonable cost of these repairs." *Id*. at ¶ 47. However, MBIC refused to recognize that an appropriate long-term repair of all flat roofs on the building was necessary despite the fact that its own inspector indicated that the flat sections of the roof were "severely deteriorated." *Id*. at ¶¶ 48-49.

Because a new tennis season was approaching and UDSC believed it would "suffer massive business losses if its roof was leaking," UDSC decided to proceed with the repairs that were approved by MBIC. *Id*. at ¶ 50. TEC performed the repairs. *Id*. at ¶ 51.

On August 30, 2023, MBIC wrote to TEC, noting that it was issuing a payment in the amount of $649,955.51, "which it contended was the market standard price for the work performed by TEC." *Id*. at ¶ 52. According to Plaintiffs, MBIC based this value on the "price list from the date of loss in 2021, despite the fact that the reason for the delay had been MBIC's refusal to approve the appropriate repair." *Id*. at ¶ 53. MBIC also refused to approve payment for overhead and profit, "despite the fact that overhead and profit is industry standard for a complex commercial project of this size." *Id*. at ¶ 54.

During the repair process, a pipe was broken at the Tennis Club. *Id*. at ¶ 55. MBIC has refused to pay for the repair of the pipe. *Id*. at ¶ 56. Plaintiff claims that based on an updated price list and the inclusion of overhead and profit, the amount owed to TEC is $857,783.35. In addition, Plaintiff claims that "in order for it to complete an appropriate, long-term repair to the shingle/flat roof junctions that were fixed with a temporary repair, it will now need to incur approximately $119,145.80 in additional costs to ensure a water-tight seal between the main flat roof section and the adjoining shingle sections at the center of the tennis club's roof, directly over the office and customer areas." *Id*. at ¶ 58.

In Count One of the Amended Complaint, Plaintiffs assert a claim against MBIC for breach of contract, claiming that MBIC breached the Policy by refusing to issue payment for the roof in the amount of $857,783.35 as well as for $119,145.80 in additional costs. *Id*. at ¶¶ 64-73. Plaintiffs claim that MBIC "refused to authorize a commercially reasonable repair of the Tennis Court's flat roof and instead insisted that an unreliable and inappropriate method be used." *Id*. at ¶ 69.

In Count Two, Plaintiffs allege that MBIC's actions constitutes bad faith under 42 Pa.C.S.A. § 8371. *Id.* at ¶¶ 74-83. Specifically, Plaintiffs claim MBIC "deliberately delayed inspections and communications with Plaintiffs in an effort to force UDSC into a position where it would potentially face lost business due to continued leaking of its roof in order to force UDSC to agree to an inadequate repair of its property." *Id.* at ¶ 78. Plaintiff further claims MBIC "repeatedly and unambiguously acknowledged liability and offered coverage under the Policy, only to first indicate it would breach the Policy in August 2023. *Id*. at ¶ 79. Plaintiffs allege that MBIC now contends in bad faith that Plaintiffs' claim is time-barred despite "*d*eliberately inducing" Plaintiffs to not file suit. *Id*.

In Count Three, Plaintiff TEC asserts a claim against MBIC for tortious interference with existing contractual relations. *Id*. at ¶¶ 84-92. TEC alleges that it and UDSC entered into a valid contract for the repair of the Tennis Club's roof based on industry standard pricing subject to approval by MBIC, that MBIC was aware of this contract, that UDSC did not pay TEC for the work it performed and that MBIC willfully and in bad faith caused UDSC to breach its contract with TEC by failing to issue payment. *Id.* at ¶¶ 85, 89, 90, 91.

Finally, in Count Four, Plaintiffs assert an alternative claim for promissory estoppel.[1] *Id.* at ¶¶ 93-98. Plaintiffs allege that "[a]fter substantial negotiations, on August 8, 2023, [MBIC] wrote to TEC and UDSC, stating:

> 1. We have agreed to provide coverage to place 3/8" plywood over the existing tongue and groove decking. During our inspection, we observed distress and indentation with the T & G decking which would not allow for a nailable surface for the

---

[1] Plaintiffs asserted this claim in case the Court ruled that their breach of contract claim was time-barred. ECF 15-1 at p. 13.

new 25-year tab roof. We would provide coverage to place the plywood over the existing T & G but not to repair the distress and indentation.

2. We are agreeing to remove and replace the troughs (6), but not the main flat roof on the building.

3. We will be providing an estimate to TEC to review and come to an agreed cost of repairs.

4. Work related to code (decking and troughs) will be paid as incurred cost based on ordinance and law.

5. All future payments will be made payable to UDSC.

*Id.* at ¶ 94; ECF 9-8. Plaintiffs allege that MBCI "knew that TEC and UDSC would rely on its representations that it was providing coverage for the loss and approved repairs." *Id*. at ¶ 95. Plaintiffs also allege that in "justifiable reliance on the August 8, 2023 letter, UDSC authorized TEC to perform the work approved by [MBIA.]" *Id*. at ¶ 96.

## **DISCUSSION**

MBIC first argues that UDSC must be dismissed as a Plaintiff in this action because it lacks standing to assert any claims given the fact that UDSC assigned its claims under the Policy to TEC.

Plaintiffs respond that the only reason they are both listed as Plaintiffs is because MBIC rejected the assignment from UDSC to TEC after TEC accused MBIC of acting in bad faith. *Id*. at 44. Plaintiffs contend that they both must remain as Plaintiffs until the issue of the enforceability of the assignment is before the Court.

Although the Amended Complaint alleges that MBIC later rejected the assignment *id*., MBIC now contends that it is "not challenging the assignment" and therefore there is no longer any need for UDSC to remain as a Plaintiff in the case. ECF

18, pp.1-2. The Court agrees but will hold MBIC to its representation that it is no longer challenging the assignment of UDSC's rights to TEC. Therefore, USDC and its claims against MBIC are stricken from the Amended Complaint.

MBIC next argues that the breach of contract claim must be dismissed as time-barred because it was brought outside the Policy's two-year limitation clause for bringing suit. According to MBIC, the Policy's suit limitation clause precludes any legal action against MBIC unless there has been full compliance with all of the terms of the Coverage part, and the action is brought within two years after the date on which the direct physical loss or damage occurred. See ECF 14-3. Since Plaintiffs alleges that the loss occurred in mid-2001 but did not bring this suit until July 17, 2024, MBIC claims the breach of contract claim is barred by the suit limitation clause.

Plaintiffs acknowledge the limitations clause but argue that the contractual limitations period may be waived, where, as here, MBIC continued to represent to Plaintiffs throughout their negotiations that it intended to provide coverage for the loss.

Under Pennsylvania law, 'contractual limitations on the time to commence suit,' [ ] are generally considered to be valid and enforceable 'where the specified time within which suit was to be brought [is] not unreasonable.'" *B.S. Ingersoll, LLC v. Great American Insurance Co.*, 2023 WL 7544158 at * 4 (E.D. Pa. 2023) quoting *Commonwealth v. TransAmerica Ins. Co.,* 341 A.2d 74, 77 (Pa. 1975). However, the limitations period is subject to waiver. *Id.* "[W]aiver need not be expressed, but may be inferred from the acts of the insurers evidencing a recognition of liability, ... or from their denial of obligation exclusively for other reasons" or "actions [that] lead[ ] the insured to believe that the limitation period will not be relied upon.*" Id.* (quotation omitted).  "[I]f in

the course of the negotiations the company gave the plaintiff reasonable grounds for believing that the time limit would be extended or that such provision would not be strictly enforced, it could not subsequently insist on its strict enforcement without giving him a reasonable time thereafter to bring his action." *Id. (*quotation omitted).

Accepting the Plaintiff's allegations as true, the Court finds that the Amended Complaint clearly demonstrates that MBIC, through its own actions, waived the contractual limitations period. MBIC dragged its feet during a portion of the limitations period by failing to approve a commercially reasonable repair (over-decking) while instead insisting that the cheaper but inadequate tie-in method was feasible. Nevertheless, MBIC continued to represent to UDSC that the roof repairs would be covered under the Policy and that "it was merely a matter of what type of repair would be offered." Am. Compl. at ¶¶ 24, 42, 47. In its August 8, 2023 letter to TEC and UDSC, which is alleged to have been written **after** the two-year period had expired, MBIC stated that it was providing coverage and specified the repairs it was authorizing. *Id*. at ¶ 94. Finally, Plaintiff does not allege that MBIC at any time during the negotiations between the parties was even considering asserting the limitations period as a defense, nor that there was ever ultimately a written denial of coverage.

Accepting Plaintiff's allegations as true, the Court finds that by failing to raise the possibility of asserting the limitations defense during its negotiations with Plaintiffs (or after the limitations period expired) and instead repeatedly lead Plaintiffs to believe that it would be providing coverage, MBIC has waived the two-year limitations period as a defense to Plaintiff's breach of contract claim.

MBIA also moves for dismissal of Plaintiffs' bad faith claim, asserting that Plaintiffs' claim consists of "nothing but boilerplate conclusory allegations." ECF 14-2 at p. 12. The Court does not agree.

Pennsylvania's Bad Faith Statute, 42 Pa. Cons. Stat. Ann. § 8371 ("§ 8371"), creates a private right of action in the event "an insurer has acted in bad faith toward the insured." Pennsylvania courts define bad faith as "[a] frivolous or unfounded refusal to pay proceeds of a policy ... a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith." *Nw. Mut. Life Ins. Co. v. Babayan,* 430 F.3d 121, 137 (3d Cir.2005) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (quoting Black's Law Dictionary 139 (6th ed.1990))). An action for bad faith is not restricted to the denial of a claim but may also extend to the insurer's investigative practices. *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A. 2d 901, 906 (Pa. Super. 1999).

In order to establish a claim for bad faith under §8371, a plaintiff must demonstrate, by clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits under the insured's policy, and (2) that the insurer knew or recklessly disregarded the lack of a reasonable basis in denying the claim. *Keefe v. Prudential Prop. & Cas. Ins. Co.,* 203 F.3d 218, 225 (3d Cir.2000); *Condio v. Erie Ins. Exch.,* 899 A.2d 1136, 1142 (Pa.Super.Ct.2006). "[B]ad faith is not present merely because an insurer makes a low but reasonable estimate of an insured's damages." *Johnson v. Progressive Ins. Co.,* 987 A.2d 781, 784 (Pa.Super.Ct.2009) (citing *Condio,* 899 A.2d at 1142–43).

Since this case is still at the pleading stage, the Court finds that Plaintiffs have established both elements of a claim for bad faith under §8371. Plaintiffs' claim arises from MBIC's allegedly stubborn refusal to recognize that the "tie-in" method was not a viable means of repairing UDSM's roof, despite the fact that even its own consultant could not demonstrate the viability of using the "tie-in" method and that Plaintiffs' consultants readily concluded that the "tie-in" method was not an option. The Amended Complaint alleges that MBIC's refusal to authorize the over-decking method was solely because the "tie-in" method was cheaper and that MBIC attempted to force Plaintiffs into accepting the cheaper alternative in light of the fast-approaching fall tennis season. Am. Compl. at ¶ 78. The Amended Complaint further alleges that MBIC repeatedly acknowledged its liability and offered coverage to Plaintiffs, yet denied full coverage in August of 2023 and then claim for the first time in this action that Plaintiffs' claim was time-barred. *Id*. at ¶ 79. As plead, MBIC's actions are illustrative of a lack of reasonable basis for refusing to authorize the over-decking method in a timely manner and that MBIA knew of or recklessly disregarded the lack of a reasonable basis for taking such actions. It may ultimately be gleaned from discovery that MBIC did not act in bad faith, but at this stage of the proceedings, Plaintiffs' claim may proceed.

MBIC also seeks dismissal of TEC's claim for interference with existing contractual relations. "Under Pennsylvania law, to prevail on a claim for tortious interference  with existing . . .relationships, a party must prove: (1) the

existence of a contractual . . .or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship . . .; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct . . ." *Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F. 3d 199, 212 (3d Cir. 2009).  With respect to the second element, "when a defendant breaches 'his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationships with third parties have been affected,' tortious interference cannot lie." *Abraham v. Thomas Jefferson University*, 2024 WL 1120987 at * 49 (E.D. Pa. 2024) quoting *Glazer v. Chandler*, 200 A.2d 416, 418 (1964).

Plaintiffs have satisfied the first element by alleging the existence of a contract between them for TEC to repair UDSC's roof. MBIC argues that TEC has failed to satisfy the second element, i.e. that MBIC specifically intended to harm the contractual relationship between TEC and UDSC. With respect to the second element, Plaintiffs allege that MBIC willfully and in bad faith caused UDSC to breach its contract with TEC by failing to issue proper payment. Am. Compl. at ¶¶ 87, 91.  While discovery may ultimately reveal that MBIC did not specifically intend to harm TEC's contractual relationship with UDSC as required by *Glazer*, *supra*, Plaintiffs' allegations, which must be accepted as true, satisfy the elements for a claim of interference with contractual relations.

Finally, because The Court has ruled that Plaintiffs' breach of contract claim is not barred by the two-year limitations period contained in the Policy, Plaintiffs' alternate promissory estoppel claim is dismissed with prejudice.

An appropriate Order follows.